**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **BEECHER CARLSON HOLDINGS, INC. and BEECHER CARLSON INSURANCE SERVICES, LLC,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **CIVIL ACTION FILE NO.** |
| **STERN RISK PARTNERS LLC, MICHAEL STERN, and MARK OUIMETTE,** | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiffs Beecher Carlson Holdings, Inc. (hereafter "BCHI") and Beecher Carlson Insurance Services, LLC (hereafter "BCIS") and collectively (Beecher Carlson") file this Complaint against Defendants Stern Risk Partners LLP, Michael Stern, and Mark Ouimette, and, in support thereof, state and say as follows:

## THE PARTIES

1. Plaintiff **Beecher Carlson Holdings, Inc. ("BCHI")** is a Delaware corporation with its principal place of business at 6 Concourse Parkway, Suite 2300, Atlanta, Fulton County, Georgia 30328. Prior to a name change in 2004,

BCHI was known as Risk Strategy Partners, Inc. BCHI is a subsidiary of Brown & Brown, Inc.

2. Plaintiff **Beecher Carlson Insurance Services, LLC ("BCIS")** is a California corporation with its principal place of business at 6 Concourse Parkway, Suite 2300, Atlanta, Fulton County, Georgia 30328. BCIS is a subsidiary of Plaintiff BCHI. Effective July 1, 2004, Beecher Carlson acquired a Colorado company called RiskCap, Inc. In March 2012, RiskCap, Inc. was merged into BCIS. Therefore BCIS is the successor of RiskCap, Inc.

3. Beecher Carlson is a large account risk management broker, offers a broad range of insurance and reinsurance products and services, as well as risk management, third-party administration and managed health care programs. These products and services include these programs: property risk management, captive insurance management & consulting (including creating the most efficient and economically feasible method to solve a business' specific insurance cost, coverage and profit needs; and captive management), claims management & consulting services (including designing, placing and monitoring of business customers' claims management programs and comprehensive management assistance with all stages of the claims cycle), casualty risk management services (including primary and excess casualty placements and accurate certificate

issuance to actuarial consulting services), cyber liability, employee benefits, environmental liability, executive liability, private equity/mergers and acquisitions, and risk services and pre-loss consulting. Beecher Carlson provides its services to business, public entity, individual, trade and professional association clients, including in the following markets or industries: real estate, technology, public entities, hospitality, manufacturing, healthcare, and financial services.

4. Defendant **Stern Risk Partners LLC ("SRP"** or **"Stern Risk Partners")** is a Delaware corporation, formed on or about August 27, 2014, which is registered to do business in and does do business in the State of Georgia. Stern Risk Partners is a "boutique insurance brokerage and captive management firm founded by [Defendants] Michael Stern and Mark Ouimette". According to the Georgia Secretary of State, Defendant Stern Risk Partners registered its principal place of business as 3900 South Wadsworth Blvd., Suite 370, Lakewood, Colorado 80235; however the spokesperson for Stern Risk Partners issued a press release stating that Stern Risk Partners is an Atlanta based business. Defendant Stern Risk Partners may be served with process in this litigation through its registered agent for service of process in Georgia, Michael Stern, at 13294 Osborne Road, Atlanta, DeKalb County, Georgia 30319-2363.

5. Defendant Michael Stern is an individual who is a citizen and resident of the State of Georgia. Michael Stern may be served with process at his residence at 13294 Osborne Road NE, Atlanta, DeKalb County, Georgia 30319-2363. Michael Stern is a co-founder of, a co-owner of, a member of, an employee of, and the Chief Executive Officer of Defendant Stern Risk Partners LLC. Stern Risk Partners' Application for Certificate of Authority in Georgia, signed February 9, 2015, and filed February 12, 2015, states that Michael Stern is its "Manager".

6. Defendant Mark Ouimette is an individual who is believed to reside in the State of Colorado. Mark Ouimette is a co-founder of, an owner of, a member of, an employee of, and the President of Defendant Stern Risk Partners LLC. Stern Risk Partners' Application for Certificate of Authority in Georgia, filed February 12, 2015, was signed by Mark Ouimette on February 9, 2015, and his title was indicated as "Member Manager".

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over the subject matter of this civil action under 28 U.S.C. §1331, because a claim is asserted herein against Defendants which arises under the federal Computer Fraud and Abuse Act (CFAA) (18 U.S.C. §1030, *et seq*.) and this Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367(a) because the remaining claims are so

related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

8. Fulton County and DeKalb County, Georgia, are within the district presided over by the United States District Court for the Northern District of Georgia.

9. This Court has personal jurisdiction over Defendant Michael Stern because he resides in DeKalb County, Georgia and/or conducts business in DeKalb County and Fulton County, Georgia and because he breached contractual obligations owed to, committed tortious acts and omissions against, and caused tortious injuries to BCHI and BCIS in Fulton County, Georgia.

10. This Court has personal jurisdiction over Defendant Michael Stern and venue is proper in this Court and the Atlanta Division of this Court for the additional and independent reason that that Defendant Michael Stern agreed to such jurisdiction and venue in Paragraph 13 of Michael Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> Forum Selection and Consent to Jurisdiction. Any action to enforce this Agreement, as well as any action relating to or arising out of this Agreement, shall be filed only in: (a) the United States District Court for the Northern District of Georgia, Atlanta Division; or (b) the Superior Court of Fulton County, Georgia. With respect to any such court action, I hereby (a) irrevocably submit to the personal

> jurisdiction of such courts; (b) consent to service of process; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process.

11. This Court has personal jurisdiction over Defendant Stern Risk Partners LLC (a) because Stern Risk Partners consented to jurisdiction of the Georgia courts by registering itself with the Georgia Secretary of State to do business in Georgia, including performing services in Atlanta, Fulton County and DeKalb County, Georgia, and (b) because by participating in and benefiting from Defendant Michael Stern's and Defendant Mark Ouimette's conduct and inducing breach of their employment related contracts with Beecher Carlson, Defendant Stern Risk Partners committed tortious acts and omissions against and caused tortious injuries to BCHI and BCIS in Fulton County, Georgia. Defendant Stern Risk Partners has sufficient minimum contacts with the Northern District of Georgia and purposefully availed itself of the privilege of conducting activities in the Northern District of Georgia. This Court also has personal jurisdiction over Defendant Stern Risk Partners because the causes of action asserted in this Complaint relate to, and arise from, Defendant Stern Risk Partners' minimum contacts with the Northern District of Georgia. This Court's exercise of personal jurisdiction over Defendant Stern Risk Partners does not offend traditional notions of fair play or substantial justice.

12. Under O.C.G.A. §9-10-91, this Court has personal jurisdiction over Defendant Mark Ouimette because he transacts business in Georgia, including in Fulton and DeKalb Counties, including regularly traveling to Georgia, in connection with his formation of, ownership of, and work for Stern Risk Partners, because he personally, or through his agents Michael Stern and Stern Risk Partners LLC, breached and induced breach of contractual obligations owed to, committed tortious acts and omissions against, and caused tortious injuries to BCHI and BCIS in the Northern District of Georgia, because he wrongfully destroyed data on servers (which were 'protected computers') located in Fulton County, Georgia, and because he committed tortious injuries in the Northern District of Georgia and regularly does or solicits business, has engaged in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in the Northern District of Georgia and in Georgia. In addition, the Court has personal jurisdiction over Ouimette because the causes of action asserted herein relate to, and arise from, Ouimette's contacts with and wrongful conduct within the Northern District of Georgia. The Court's exercise of jurisdiction over Ouimette does not offend traditional notions of fair play and substantial justice.

13. Venue is proper in the United States District Court for the Northern District of Georgia, under 28 U.S.C. §1391 and in the Atlanta Division of this Court under Local Rule 3.1(B):

(a) Because Plaintiffs' principal place of business is in this District,

(b) Because Defendant Stern Risk Partners maintains an office and conducts business in this District and is subject to this Court's personal jurisdiction with respect to this action, because Stern Risk Partners unlawfully induced Michael Stern to breach his employment agreement which contains a forum selection clause expressly consenting to the jurisdiction and venue of this Court, and because Stern Risk Partners has engaged in tortious and wrongful conduct and omissions which give rise to the claims asserted herein, a substantial part of which conduct and omissions occurred in this District,

(c) Because Defendant Michael Stern resides in and conducts business in this District and is subject to this Court's personal jurisdiction with respect to this action, because his employment agreement contains a forum selection clause expressly consenting to the jurisdiction and venue of this Court and the Atlanta Division of this Court, and because he has engaged in tortious and wrongful conduct and omissions which give rise to the claims

asserted herein, a substantial part of which conduct and omissions occurred in this District, and because he wrongfully destroyed data housed on servers located in Fulton County, Georgia; and

(d) Because Defendant Mark Ouimette has engaged in tortious and wrongful conduct and omissions which give rise to the claims asserted herein, a substantial part of which conduct and omissions occurred in this District, including unlawfully inducing breach of Michael Stern's employment agreement which contains a forum selection clause expressly consenting to the jurisdiction of this Court, and including wrongfully destroying data housed on servers (which were 'protected computers') located in Fulton County, Georgia.

## THE EMPLOYMENT AGREEMENTS

MICHAEL STERN'S EMPLOYMENT AGREEMENTS

14. Defendant Michael Stern was employed as Vice-President of Finance by Risk Strategy Partners, Inc. on or about April 2, 2004.

15. On or about April 2, 2004, Michael Stern entered into and signed a Non-Solicitation And Confidentiality Agreement with his then employer Risk Strategy Partners, Inc. A true and correct copy of the Non-Solicitation And

Confidentiality Agreement, bearing Michael Stern's signature, is attached hereto in Exhibit "A".

16. Risk Strategy Partners, Inc. changed its name to Beecher Carlson Holdings, Inc. in 2004 and therefore BCHI is the employer party to the April 2, 2004 Non-Solicitation And Confidentiality Agreement signed by Michael Stern.

17. On or about February 11, 2010, Michael Stern signed and entered into a 2010 Large Account Producer Compensation Plan, with Beecher Carlson Insurances Services, LLC, ("BCIS") a subsidiary of Beecher Carlson Holdings, Inc. ("BCHI"). A true and correct copy of the 2010 Large Account Producer Compensation Plan, bearing Michael Stern's signature, is attached hereto in Exhibit "A".

18. On or about February 11, 2010, Michael Stern signed and entered into a 2010 Large Account Producer Compensation Plan Addendum, with Beecher Carlson Insurances Services, LLC, ("BCIS") a subsidiary of Beecher Carlson Holdings, Inc. ("BCHI"). A true and correct copy of the 2010 Large Account Producer Compensation Plan Addendum, bearing Michael Stern's signature, is attached hereto in Exhibit "A".

19. On or about October 25, 2013, Michael Stern signed a six page Brown & Brown Application for Employment, in which he acknowledged his job position

as 'Managing Director - Sales' for Beecher Carlson. At the time, Beecher Carlson had recently been acquired by Brown & Brown and is still owned by Brown & Brown. In this Application for Employment, Michael Stern agreed that "In consideration of employment, I agree to obey the rules and standards of Brown & Brown, Inc."

20. Paragraph 1 of Michael Stern's April 2, 2004, a Non-Solicitation And Confidentiality Agreement describes his Employer as being "in the business of providing insurance brokerage, risk management, and related captive and consulting services". Paragraph 1 also emphasizes that by virtue of his employment, Michael Stern would "have substantial contact with the Employer's customers and potential customers and that the Employer's relationship with its customers and potential customers were developed by the Employer at considerable expense." And Paragraph 1 also explains that his Employer's relationships with its customers and potential customers "provide the Employer with a substantial competitive advantage, and constitute a substantial part of its goodwill."

21. On or about June 25, 2013 Michael Stern signed his Employee Acknowledgement for the Brown & Brown Employee Handbook (Effective Date 09/09/2011). As stated above, in his Brown & Brown Application for

Employment, Michael Stern agreed that "In consideration of employment, I agree to obey the rules and standards of Brown & Brown, Inc." The Brown & Brown Information Technology Guidelines (ITGs) are incorporated into the Brown & Brown Employee Handbook by reference.

MARK OUIMETTE'S EMPLOYMENT AGREEMENTS

22. Defendant Mark Ouimette was employed as Consultant and Vice-President by RiskCap, Inc. on or about October 1, 2003.

23. On or about October 1, 2003, Mark Ouimette entered into and signed an Employment Contract with his then employer RiskCap, Inc. A true and correct copy of the Employment Agreement, bearing Mark Ouimette's notarized signature, is attached hereto in Exhibit "B".

24. Effective July 1, 2004, RiskCap, Inc. was acquired by Beecher Carlson. In March, 2012, RiskCap, Inc. was merged into Plaintiff BCIS. Therefore BCIS is the employer party to and successor of RiskCap, Inc. with respect to the 2003 Employment Contract signed by Mark Ouimette.

25. Plaintiff BCIS is also entitled to enforce the 2003 Employment Contract signed by Mark Ouimette as the successor to RiskCap, Inc. by virtue of paragraph 8 of that Employment Contract, which states:

> Successors - This Agreement shall be binding on the parties' hereto and their heirs, successors, and assignees, and shall continue and remain in full force and effect after termination of employment of Ouimette.

26. Mark Ouimette's RiskCap Employment Contract was modified by the Term Sheet signed April 14, 2009 with Beecher Carlson (BCIS). A true and correct copy of this Term Sheet bearing Mark Ouimette's signature is attached hereto as Exhibit "B". This Term Sheet specifically stated that:

> Miscellaneous. This Term Sheet supersedes all other employment contracts, term sheets, and offer letters. Your existing non-solicitation and confidentiality agreement remains unchanged.

27. According to the April 14, 2009 Term Sheet, Mark Ouimette's job title for Beecher Carlson was Managing Director, and he was responsible for the Captive Product Group and the production and retention of company clients.

28. On or about July 9, 2013, Mark Ouimette signed a Brown & Brown Application for Employment And New Hire Data Form (Acquisition Only), in which he acknowledged his job position as 'Managing Director - Beecher Carlson; Captive Insurance Consulting'. At the time, Beecher Carlson had recently been acquired by Brown & Brown and is still owned by Brown & Brown. In this Application for Employment, Mark Ouimette Stern agreed that "In consideration of employment, I agree to obey the rules and standards of Brown & Brown, Inc."

29. The Statement of Purpose in Mark Ouimette's 2003 Employment Contract states that his Employer's "business is highly competitive and specialized and requires special training and ability." The Statement of Purpose also describes his Employer's business as:

> acting as a risk management, property and casualty insurance and employee benefit consultant; a captive, pool, trust and risk retention group management firm; and a claim administrator for various persons, firms, associations, institutions, governmental entities, and corporations and in connection therein with advises clients as to all types of risk management and insurance matters and designs; negotiates and manages for its clients all types of insurance and self-insurance programs, including keyman life insurance, travel and accident insurance, health and hospitalization, major medical insurance, workers' compensation insurance, property and casualty insurance, bonds, or other types and kinds; and administers a wide variety of claims.

30. On or about July 19, 2013, Mark Ouimette signed his Employee Acknowledgement for the Brown & Brown Employee Handbook (Effective Date 09/09/2011). As stated above, in his Brown & Brown Application for Employment, Mark Ouimette agreed that "In consideration of employment, I agree to obey the rules and standards of Brown & Brown, Inc." The Brown & Brown Information Technology Guidelines (ITGs) are incorporated into the Brown & Brown Employee Handbook by reference.

## FACTUAL BACKGROUND

31. While Still Employees of Beecher Carlson, Mark Ouimette and Michael Stern Form a Company to Unlawfully Compete With Beecher Carlson, and Conspire to Destroy Evidence and Sabotage Beecher Carlson's Business: On August 25, 2014, Cheyenne Mosely of Legal Zoom, who was acting at the behest and instructions of Michael Stern and Mark Ouimette, signed the Delaware Certificate of Formation of Stern Risk Partners LLC. At that time, Michael Stern and Mark Ouimette were still employees of Beecher Carlson and subject to the terms of the employment related agreements described above.

32. On August 27, 2014 the Certificate of Formation of Stern Risk Partners LLC was filed with the Delaware Secretary of State, Division of Corporations. At that time, Michael Stern and Mark Ouimette were still employees of Beecher Carlson and subject to the terms of the employment related agreements described above.

33. Purpose of Stern Risk Partners LLC Was and Is to Compete With Beecher Carlson: The purpose for which Michael Stern and Mark Ouimette joined in a conspiracy and formed Stern Risk Partners LLC while still employees and executives of Beecher Carlson was to compete directly with Beecher Carlson. Stern Risk Partners' own website describes itself as "a full service Commercial

Property & Casualty broker" which operates in the property & casualty, captive insurance, multi-family insurance, and resident liability markets; and further describes its business as follows:

> Stern Risk Partners is a boutique insurance brokerage and captive management firm founded by Michael Stern and Mark Ouimette. With more than five decades of combined experience in the insurance and captive industries, our senior leadership has expertise serving a variety of verticals including Construction, Residential and Commercial Real Estate, Technology, Manufacturing and Retail. Stern Risk Partners was founded on the principle that all businesses deserve the opportunity to benefit from the unique economics associated with programs that integrate traditional insurance with captives. Rather than cookie-cutter ideas, we offer creative solutions that empower our clients to find new profit centers and lower their overall insurance cost. Stern Risk Partners has offices in Atlanta, GA and Denver, CO.

34. Stern Risk Partners LLC issued a press release stating that Stern Risk Partners is an "insurance brokerage and captive management firm", that it "offers captive management services and insurance programs in residential real estate, construction and property/casualty", that it provides "captive services to U.S. domiciles but plans to expand offshore", that it has "captive management operations", and that it has "multifamily and tenant insurance programs".

35. <u>Stern and Ouimette's Sabotage and Destruction of Evidence and Beecher Carlson's Business Records:</u> Over two months after forming and starting the competing business of Stern Risk Partners LLC, Michael Stern and Mark

Ouimette, on or before November 5, 2014, surreptitiously cleaned out their Beecher Carlson offices, deleted their emails and calendars, wiped their web browser histories from company owned computers and systems, and Michael Stern factory reset and wiped the data from his company owned cell phone. Mark Ouimette failed to provide Beecher Carlson with the pass word to his company owned cell phone, thereby rendering Beecher Carlson's phone useless and preventing access to the Beecher Carlson business records and data stored thereon. These acts and omissions were committed by Michael Stern and Mark Ouimette knowingly and intentionally in coordination with each other, by agreement with each other, and as part of their unlawful conspiracy with each other and with Stern Risk Partners LLC, for the express purposes of destroying information belonging to Beecher Carlson or depriving Beecher Carlson of access to its business records and data, and of destroying evidence of their conspiracy and wrongdoing. These acts and omissions were committed by Michael Stern and Mark Ouimette in the course and scope of their conspiracy with each other and with Stern Risk Partners LLC and (a) constituted deliberate sabotage of Beecher Carlson's business, (b) intentional interference with Beecher Carlson's relationship with its customers, (c) destroyed data belonging to Beecher Carlson, (d) were done before or within hours of either Michael Stern or Mark Ouimette submitting a resignation to Beecher

Carlson, (e) were done on Beecher Carlson's company time for which Stern and Ouimette were paid, (f) were accomplished by unauthorized use of Beecher Carlson's 'protected computers', including phones, computer servers, and personal computers, and (g) were done without notice to or permission or authorization from any executive of Beecher Carlson. Much of the data which Stern and Ouimette deleted, they deleted from Beecher Carlson's servers (which were 'protected computers') located in Atlanta, Fulton County, Georgia; for instance the deleted emails and the calendar data were hosted on those servers.

36. Stern and Ouimette Surreptitiously Copy and Purloin Beecher Carlson's Business Records, Trade Secrets, and Confidential Information: Upon information and belief, Stern and Ouimette downloaded and copied, without authorization or permission, trade secret and confidential Beecher Carlson data, including sensitive and confidential customer data, in the course and scope of the conspiracy described herein, and without authorization from Beecher Carlson, on at least the following occasions and by the following means:

(a) on October 3, 2014 at 5:45 am, Michael Stern attached USB Flash Disk USB Device, Serial #CCCB1202240917090390164011&0 to his Beecher Carlson computer;

(b) then on November 3, 2014 at 4:55 pm, just before his surreptitious November 5 resignation, Michael Stern attached two USB flash drives (SanDisk Cruzer Glide USB Device, Serial #4C530301650619112015&0 and USB2.0 FlashDisk USB Device, Serial #AA04012700014534&0) to his Beecher Carlson computer;

(c) finally, on November 4, 2014 at 6:31 pm, just before his surreptitious resignation, Michael Stern attached a USB flash drive (SanDisk Cruzer Glide USB Device, Serial #4C530301650619112015&0) to his Beecher Carlson computer;

(d) on October 7, 2014, Mark Ouimette attached a USB drive (Imation USB Flash Drive USB Device, Serial #AA407081114021&0) to his Beecher Carlson computer;

(e) then on October 30, 2014, Mark Ouimette attached another USB drive (Verbatim STORE N GO USB Device, Serial #070144E244655B66&0) to his Beecher Carlson computer; and

(f) then on November 4, 2014 at 12:33 pm, the day of or before his surreptitious resignation, Mark Ouimette attached a third USB drive (Verbatim STORE N GO USB Device, Serial #0701487C26C22061&0) to Beecher Carlson computer.

37. Ouimette and Stern Surreptitiously Resign and Sneak Away: In the evening of November 4, 2014 or the early morning hours of November 5, 2014, Mark Ouimette left a written one-line resignation letter on the desk of Jason Flaxbeard, a Senior Managing Director for Beecher Carlson. On November 5, 2014, at 10:42 am Eastern Time, Michael Stern sent via email a one line resignation to Steve Denton, the CEO of BCIS.

38. Stern Wipes His Company Cell Phone: Michael Stern factory reset and wiped his company owned cell phone, a 'protected computer', on November 5, 2014, probably within an hour or two of his emailed resignation. Stern's destruction of this information and evidence was deliberate, willful, knowing, performed in the course and scope of the conspiracy described herein, and without authorization or permission from Beecher Carlson.

39. Both Michael Stern and Mark Ouimette were on Beecher Carlson's payroll before and on November 5, 2014 and were paid by Beecher Carlson for their services as employees through and including November 5, 2014.

40. No Hand Off of Work in Progress: Neither Michael Stern nor Mark Ouimette ever called or otherwise communicated with any Beecher Carlson executive to 'hand off' work in progress, alert Beecher Carlson to meetings with

customers which had been scheduled, or in any other way attempt to ameliorate or mitigate their destruction and sabotage of Beecher Carlson's business records.

STERN'S BREACHES OF HIS EMPLOYMENT AGREEMENT:

41. Stern's Failure to Return Data Furnished or Produced by Him: By failing to return to Beecher Carlson the "documents, records, data, apparatus, equipment and physical property" "furnished to him" by Beecher Carlson or "produced by him in connection with his employment", Michael Stern breached Paragraph 6(c) of Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> (c) Documents, Records, etc. All documents, records, data, apparatus, equipment and physical property, whether or not pertaining to Confidential Information, Trade Secrets, or Employer-Related Inventions and Developments, which are furnished to me by the Employer or are produced by me in connection with my employment will be and remain the sole property of the Employer. I will return to the Employer all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Employer. In any event, I will return all such materials and property immediately upon termination of my employment for any reason. I will not retain any such material or property or any copies, compilations, or analyses thereof after such termination.

42. Stern's Developments were the Sole Property of Beecher Carlson: Michael Stern developed the concept, the business methods, the market strategies,

and the operations of Stern Risk Partners while employed by Beecher Carlson and by using the services of at least one other Beecher Carlson employee (Mark Ouimette) to do so. By failing to turn over that development to Beecher Carlson, Michael Stern breached Paragraph 6(d) of Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> (d) Assignment of Inventions and Developments. I agree that all Employer-Related Inventions and Developments which I conceive or develop, in whole or in part, either alone or jointly with others, during the term of my employment with the Employer will be the sole property of the Employer. The Employer will be the sole owner of all patents, copyrights and other proprietary rights in and with respect to such Employer-Related Inventions and Developments. To the fullest extent permitted by law, such Employer-Related Inventions and Developments will be deemed works made for hire. I hereby transfer and assign to the Employer any proprietary rights which I may have or acquire in any such Employer-Related Inventions and Developments, and I waive any other special rights which I may have or accrue therein. I agree to execute any documents and take any actions that may be required to effect and confirm such transfer, assignment and waiver.
>
> The provisions of this Section 6(d) will apply to all Employer-Related Inventions and Developments which are conceived or developed by me during the term of my employment with the Employer, whether or not further development or reduction to practice may take place after termination of my employment, for which purpose it will be presumed that any Employer-Related Inventions and Developments conceived by me which are reduced to practice within one year after termination of my employment were conceived during the term of my employment with the Employer unless I am able to establish a later conception date by clear and convincing evidence.

> I agree promptly to disclose to the Employer, or to persons designated by it, all Employer-Related Inventions and Developments which are or may be subject to the provisions of this Section 6(d).
>
> I further agree to assist the Employer, at the Employer's request from time to time and at its expense, to obtain and enforce patents, copyrights or other proprietary rights with respect to Employer-Related Inventions and Developments in any and all countries. I will execute all documents reasonably necessary or appropriate for this purpose. This obligation will survive the termination of my employment, provided that the Employer will compensate me at a reasonable rate after such termination for time actually spent by me at the Employer's request on such assistance.

43. <u>Extent of Service Breach:</u> By the wrongful conduct described in this Complaint engaged in by him while still a Beecher Carlson employee, Michael Stern failed to devote his full business time, best efforts, and business judgement, skill and knowledge to the advancement of Beecher Carlson's interests and to the discharge of his duties and responsibilities under his agreement, and he breached Paragraph 5 of his April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> Extent of Service. During my employment under this Agreement, I shall, subject to the direction and supervision of the Employer, devote my full business time, best efforts and business judgment, skill and knowledge to the advancement of the Employer's interests and to the discharge of my duties and responsibilities under this Agreement. I shall not engage in any other business activity, except as may be approved by the Employer; provided that nothing in this Agreement shall be construed as preventing me from:
>
> (a) investing my assets in any company or other entity in such form

> or manner as shall not require any material activities on my part in connection with the operations or affairs of the companies or other entities in which such investments are made; or
>
> (b) engaging in religious, charitable or other community or non-profit activities that do not impair my ability to fulfill my duties and responsibilities under this Agreement.

44. Breach of Disclosure of Agreement Clause: By failing to disclose to Beecher Carlson his employment by or affiliation with Stern Risk Partners, Michael Stern breached Paragraph 6(h) of his April 2, 2004 Non-Solicitation And Confidentiality Agreement, which states:

> Disclosure of Agreement. During the Restricted Term, I agree to immediately inform Employer of any employment or affiliation by me with any company other than Employer that provides Services…..

45. Wrongful Recruitment of Beecher Carlson Employees: Michael Stern wrongfully solicited to employ, recruited, and induced Beecher Carlson employees while Stern was still a Beecher Carlson employee and within two years after his surreptitious resignation on November 5, 2014, including, but not limited to, the following Beecher Carlson employees: Mark Ouimette, Brendan Healy, Aubrie DesCombes, and Cheryl Jones, and therefore Stern breached Paragraph 6(f) of his April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> Nonsolicitation of Employees. During my employment, and for two years following the termination of my employment, regardless of the reason for termination of my employment, I will not directly or indirectly (on my own behalf or on behalf of any other person,

> company, partnership, corporation or other entity), employ, solicit to employ, recruit or induce any employee of Employer who: (i) worked as an employee for Employer during my employment; (ii) with whom I worked during my employment; and (iii) who performed insurance brokerage, risk management or related consulting services for Employer customers while employed by the Employer.

46. Wrongful Solicitation of Beecher Carlson Customers: Michael Stern solicited Beecher Carlson customers during his employment with Beecher Carlson and within two years after his surreptitious resignation on November 5, 2014, for the purpose of selling that customer the insurance brokerage, risk management, or related consulting services that Stern provided to that customer on behalf of Beecher Carlson, including, but not limited to, the following Beecher Carlson customers:

> Asset Essentials Holdings LLC,
> AppFolio, Inc.,
> Terra Mar Ins. Co. (AppFolio, Inc.),
> Embassy Insurance Corporation (Camelot Homes),
> Gulf Atlantic Casualty Ins. Co.,
> South States Ins. Co. (New South Construction Co.),
> Perimeter Ins. Co. (Cachet Homes),
> Remington Ins. Co., and
> GoldOller Real Estate Investments.

By wrongfully soliciting customers as described above, Stern breached Paragraph 6(e) of his April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> Nonsolicitation of Customers. During my employment, and for two years following the termination of my employment, regardless of the reason for termination of my employment, I hereby expressly covenant and agree that I will not, on my own behalf or on behalf of any other person, company, partnership, corporation or other entity, solicit any customer of Employer for the purpose of selling that customer the insurance brokerage, risk management, or related consulting services that I provided to that customer on behalf of Employer (either directly or because I was directly responsible for the supervision and coordination of providing those services on behalf of Employer) during the last twenty-four (24) months of my employment.

47. Stern's Misappropriation of Confidential Information and Trade Secrets: By the wrongful conduct described in this Complaint, by taking and using for his benefit and the benefit of his co-conspirators, and by joining together with and conspiring with others who also misappropriated and misused Beecher Carlson's trade secret and confidential information, all of which was done without any written consent from Beecher Carlson, both during his employment with Beecher Carlson and thereafter, Michael Stern breached Paragraph 6(b) of his April 2, 2004 Non-Solicitation And Confidentiality Agreement which states:

> Confidentiality and Trade Secret Protection. I understand and agree that my employment creates a relationship of confidence and trust with the Employer with respect to all Confidential Information. At all times during my employment with the Employer and for a period of two (2) years after my termination, I will keep in confidence and trust all such Confidential Information, and will not use or disclose any such Confidential Information without the written consent of the Employer, except as may be necessary in the ordinary course of performing my duties to the Employer. Further, at all times, both

> during my employment with the Employer and after my termination, I will keep in confidence and trust and maintain the secrecy of all of the Employer's Trade Secrets, for so long as such information remains a Trade Secret as defined herein, and I will not use or disclose any such Trade Secrets without the written consent of the Employer, except as may be necessary in the ordinary course of performing my duties to the Employer.

48. On or about June 25, 2013 Michael Stern signed his Employee Acknowledgement for the Brown & Brown Employee Handbook (Effective Date 09/09/2011). As stated above, in his Brown & Brown Application for Employment, Michael Stern agreed that "In consideration of employment, I agree to obey the rules and standards of Brown & Brown, Inc." The Brown & Brown Employee Handbook includes the following rules and standards, which Defendant Michael Stern violated by his wrongful and tortious acts and omissions set forth in this Complaint:

> Employees should not personally gain, financially or otherwise, by taking advantage of business opportunities, property or information that belongs to the Company, nor can they compete with the Company. (Page 6 Conflicts of Interest)

> Employees may not hold a directorship or office, engage in any outside business or employment, make a personal investment, or give advice or assistance (with or without compensation) that violates your duty of loyalty to the Company. (Page 7 Conflicts of Interest)

> Company and client property, including confidential business information entrusted to employees, is to be used solely for the benefit of the Company and its clients, respectively. Employees should not use Company or client property for personal benefit, nor should they

take Company or client property with them when the employment relationship has ended. (Page 7 Confidentiality and Materiality of Information)

We seek to comply with all laws and governmental regulations, and we need the cooperation of representatives of the Company to do so, and to bring lapses or violations to light. Every effort should be made by employees to ensure that they are in compliance with all laws and governmental regulations applicable to their duties on behalf of the Company. (Page 9 Compliance with Law)

All storage facilities, office and workspaces, including desks and lockers, are the property of the Company; and the Company reserves the right to have access to these areas and to such property at any time, without advance notice to any employee. Therefore, employees should not expect that such property would be treated as private and personal to the employee. Likewise, electronic mail and voicemail are also company property and are to be used only for business purposes. Internet accounts are also to be used only for company business. The Company reserves the right to inspect, monitor and have access to company computers, electronic mail, voicemail messages and Internet communications. (Page 39 Personal Property & Privacy Policy)

Employees should refrain from using company communications service and equipment for personal use. Employees should exercise care so that no personal correspondence ever appears to be an official communication of the Company. (Page 42 Personal Use of Company Equipment)

Copyrighted materials, trade secrets, proprietary financial information, or similar materials may not be transmitted (uploaded) or received (downloaded) by employees without prior authorization. (Page 42 Copyright Issues)

All Company communication services and equipment are the sole property of the Company. (Page 43 No Expectation of Privacy)

> Improper use includes, but is not limited to, any misuse as described in this policy as well as: …. use for personal gain…. or attempts to sabotage company files. (Page 44 Improper Use/Violation of Communications Policy)
>
> Resignation is a voluntary act initiated by the employee to end employment with the Company. Employees should provide a minimum of two (2) weeks notice prior to resignation. (Page 48 Voluntary Resignation)
>
> All company property must be returned at the time of separation including, but not limited to keys, PCs, laptops, cell phones, and identification cards. (Page 49 Return of Property)

49. The Brown & Brown Information Technology Guidelines (ITGs) are incorporated into the Brown & Brown Employee Handbook by reference. The November 2012 ITGs include the following rules and standards, which Defendant Michael Stern violated by his wrongful and tortious acts and omissions set forth in this Complaint:

> All email accounts maintained on our email systems are property of Brown & Brown Insurance. (ITG 18, Email, Email Accounts)
>
> Protection of Confidential and Proprietary Information. Brown & Brown employees and Company representatives shall not disclose information considered confidential or proprietary, including Company, customer, partner, supplier or any other third party information as well as information of a technical, strategic, financial, legal or commercial nature. (ITG 24, Business Communications Guidelines)
>
> All contents of the Brown & Brown's IT resources and communications systems are the property of the company. (ITG 24, Business Communications Guidelines, No Expectation of Privacy)

50. Breach of Duties of Employee and Fiduciary: On and before November 5, 2014, Michael Stern had a 'confidential relationship' with his employer Beecher Carlson within the meaning of O.C.G.A. §23-2-58, which states:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling authority over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, *etc*.

As an employee, officer, and managing director of Beecher Carlson, Michael Stern betrayed his confidential relationship with Beecher Carlson; and Michael Stern owed Beecher Carlson a fiduciary duty and a duty of good faith, fidelity, and loyalty which he tortiously and wrongfully breached by his above described breaches of Paragraphs 5 and 6 of his April 2, 2004 Non-Solicitation and Confidentiality Agreement and the other wrongful acts and omissions described above.

51. Tortious Inducement: By cooperating with, assisting, and conspiring with Mark Ouimette and Stern Risk Partners LLC to develop the concept, the business methods, the market strategies, and the operations of Stern Risk Partners while Ouimette (and Stern) were still employees of Beecher Carlson, and by conspiring with him to destroy and delete Beecher Carlson records and data,

Michael Stern and Stern Risk Partners LLC tortiously induced Mark Ouimette's below described breaches of Ouimette's 2003 Employment Contract and his fiduciary duty and his duties of good faith, fidelity, and loyalty owed to Beecher Carlson.

OUIMETTE'S BREACHES OF EMPLOYMENT CONTRACT:

52. Breach of Clause requiring Notice of Termination: By failing to give Beecher Carlson the 30 days' written notice of termination of his employment required under his 2003 Employment Contract, Mark Ouimette breached paragraph 5 of his 2003 Employment Contract, which states:

> Termination of Employment - The employment of Ouimette may be terminated by either party by providing thirty day's written notice to the other of his employment.

53. Breach of Sole Employment Clause: By the wrongful conduct described in this Complaint engaged in by him while still a Beecher Carlson employee, Mark Ouimette failed to devote his full business time and best efforts to the advancement of Beecher Carlson's interests and to the discharge of his duties and responsibilities under his agreement, and he breached Paragraph 2 of his 2003 Employment Contract which states that:

> Sole Employment - Ouimette agrees to devote himself full time during customary business hours and his best efforts to the business of

> [RiskCap], and, during the continuance of this Employment Contract, will not otherwise engage in any business of the type or kind that [RiskCap] is involved in including but not limited to, businesses relating to claims administration, casualty, accident, group, and life insurance and/or consulting for his own accounts without the prior approval of the President or Board of Directors of [RiskCap].

Ouimette never sought or obtained the prior approval of the President or Board of Directors of RiskCap, Inc. or any successor to RiskCap, Inc. for any exception to Paragraph 2 of his 2003 Employment Contract.

54. <u>Additional Breach of Sole Employment Clause:</u> Mark Ouimette further breached Paragraph 2 of his 2003 Employment Contract by joining in the conspiracy described herein with Michael Stern and Stern Risk Partners LLC, while still an employee of Beecher Carlson; by wrongfully soliciting Beecher Carlson customers while still an employee of Beecher Carlson; and by engaging in a business of the type or kind that [RiskCap] was involved in including but not limited to, businesses relating to claims administration, casualty, accident, group, and life insurance and/or consulting for his own accounts, all of which he did without the prior approval of the President or Board of Directors of RiskCap or its successor BCIS.

55. <u>Ouimette's Misappropriation of Confidential Information and Trade Secrets:</u> By the wrongful conduct described in this Complaint, by taking and using

for his benefit and the benefit of his co-conspirators, and by joining together with and conspiring with others who also misappropriated and misused Beecher Carlson's trade secret and confidential information, all of which was done without any written consent from RiskCap or its successor Beecher Carlson, both during his employment with Beecher Carlson and thereafter, Mark Ouimette breached Paragraph 6 of his 2003 Employment Contract which states that:

> Confidential Information - Ouimette understands that in performance of his services called for in this agreement, he will obtain knowledge of "confidential information" as hereunder defined, relating to the business of [RiskCap] (or any of its subsidiaries or affiliated companies). As used herein, "confidential information" means any information (including without limitation, any and all lists, formulas, patents, devices, plans, procedures, methods, processes or compilations of information or names) which:
>
> (a) is or is designed to be used in the business of [RiskCap] (or any of its subsidiaries or affiliated companies) or results from its or their research and/ or marketing activities,
>
> (b) is private or confidential in that it is not generally known or available to the public, or
>
> (c) gives [RiskCap] (or any of its subsidiaries or affiliated companies) an opportunity to obtain an advantage over competitors who do not know or use said information.
>
> Ouimette shall not, without the written consent of [RiskCap], either during the term of his employment or thereafter, use or disclose any such confidential information outside of [RiskCap] (or any of its subsidiaries or affiliated companies), publish an article with respect thereto, or, except in the performance of his services hereunder, disclose to any person, firm, or corporation any information concerning the business and affairs of [RiskCap], including any list of customers, prospects or clients, knowledge

> of which he may acquire or has acquired while performing under the terms of this Agreement, or remove from the premises of [RiskCap] any such confidential information or any property or material which relate thereto.

56. <u>Breach of Restrictions on Competition Clause:</u> By the wrongful conduct described in this Complaint, including joining together with and conspiring with others, including Michael Stern and Stern Risk Partners, to call upon and wrongfully solicit Beecher Carlson's customers and interfere with the relationship of Beecher Carlson with its customers, to misappropriate and misuse Beecher Carlson's trade secrets and confidential information, and to destroy and take Beecher Carlson data and business records, and to compete with Beecher Carlson, both during his employment with Beecher Carlson and within three years thereafter, Mark Ouimette breached Paragraph 7 of his 2003 Employment Contract which states that:

> Restrictions on Competition - Ouimette agrees and covenants that he will not, during the term of employment and for a period of three (3) years thereafter, directly or indirectly, for himself or as agent, employee, consultant, owner, partner, stockholder, or otherwise, of others call upon any then existing, former or future potential customers (future potential customers being any person or organization that [RiskCap] or Ouimette has made contact with prior to termination of employment under this Agreement for the purpose of discussing the possibility of [RiskCap] or any of its subsidiaries or affiliated companies providing its services to such future potential customers) of [RiskCap] for the purpose of soliciting and/ or selling to any of said customers claims administration, management and/or insurance services similar in nature to those designed, managed, or marketed by [RiskCap], or any of its subsidiaries or affiliated companies, or for the purpose of servicing such contracts or providing claim administration,

consulting, analytical, risk management or insurance services similar in nature to those provided by [RiskCap] (or any of its subsidiaries or affiliated companies) regardless of where such customers may be located, nor accept any offer of employment on a full-time or part-time basis from any such customers for the purposes of providing claim administration, insurance, and risk management services to such customers, or otherwise interfere with the relationship of [RiskCap] or any of its subsidiaries or affiliated companies with such customers.

It is further agreed that for purposes of the foregoing paragraph, that the three (3) year period begins from the last date of services or contact for future and former customers.

The parties hereby stipulate that the foregoing matters pertaining to competition and gravely impact the effective and successful conduct of the business of [RiskCap] and affect its reputation and good will, and that any breach of the terms in this provision regarding competition is a material breach of this agreement, from which Ouimette may be enjoined and for which Ouimette shall also pay to [RiskCap] all damages (including, but not limited to, compensatory, incidental, consequential and lost profits damages), which arise from any such a breach, together with interest, costs and attorney's fees to collect such damages. Any lawsuit for breach may be brought in the City and County of Denver, State of Colorado, which is expressly agreed by the parties to be a proper venue. This non-compete covenant is intended to be reasonable restriction as to each party.

Ouimette expressly acknowledges that he has read and is familiar with the provisions of Section 8-2-113, Colorado Revised Statutes, and pursuant to the provisions of Subparagraph (2) of said Section 8-2-113, Ouimette expressly acknowledges and agrees the (i) this Agreement is, in part, intended to protect [RiskCap's] trade secrets; (ii) Ouimette is a part of the management personnel team of [RiskCap]; (iii) Ouimette's position as an employee of [RiskCap] makes him a part of a professional staff, along with other executive and management personnel of [RiskCap]; and (iv) in light of said factors described in subparagraphs (i), (ii) and (iii) immediately above, the trade secret and non-compete provisions set forth herein are fully enforceable by [RiskCap].

57. Mark Ouimette wrongfully solicited and directly or indirectly called upon Beecher Carlson customers during his employment with Beecher Carlson and within three years after his surreptitious resignation on November 5, 2014, for the purpose of soliciting and/or selling to such customers claims administration, management and/or insurance services similar in nature to those designed, managed, or marketed by RiskCap, Inc., its successor BCIS, and their subsidiaries or affiliated companies, or for the purpose of servicing such contracts or providing claim administration, consulting, analytical, risk management or insurance services similar in nature to those provided by RiskCap, Inc., its successor BCIS, and their subsidiaries or affiliated companies; including, but not limited to, the following Beecher Carlson customers:

Asset Essentials Holdings LLC,
AppFolio, Inc.,
Terra Mar Ins. Co. (AppFolio, Inc.),
Embassy Insurance Corporation (Camelot Homes),
Gulf Atlantic Casualty Ins. Co.,
South States Ins. Co. (New South Construction Co.),
Perimeter Ins. Co. (Cachet Homes),
Remington Ins. Co., and
GoldOller Real Estate Investments.

58. On or about July 19, 2013, Mark Ouimette signed his Employee Acknowledgement for the Brown & Brown Employee Handbook (Effective Date 09/09/2011). As stated above, in his Brown & Brown Application for

Employment, Mark Ouimette agreed that "In consideration of employment, I agree to obey the rules and standards of Brown & Brown, Inc." The Brown & Brown Employee Handbook includes the following rules and standards, which Defendant Mark Ouimette violated by his wrongful and tortious acts and omissions set forth in this Complaint:

> Employees should not personally gain, financially or otherwise, by taking advantage of business opportunities, property or information that belongs to the Company, nor can they compete with the Company. (Page 6 Conflicts of Interest)
>
> Employees may not hold a directorship or office, engage in any outside business or employment, make a personal investment, or give advice or assistance (with or without compensation) that violates your duty of loyalty to the Company. (Page 7 Conflicts of Interest)
>
> Company and client property, including confidential business information entrusted to employees, is to be used solely for the benefit of the Company and its clients, respectively. Employees should not use Company or client property for personal benefit, nor should they take Company or client property with them when the employment relationship has ended. (Page 7 Confidentiality and Materiality of Information)
>
> We seek to comply with all laws and governmental regulations, and we need the cooperation of representatives of the Company to do so, and to bring lapses or violations to light. Every effort should be made by employees to ensure that they are in compliance with all laws and governmental regulations applicable to their duties on behalf of the Company. (Page 9 Compliance with Law)
>
> All storage facilities, office and workspaces, including desks and lockers, are the property of the Company; and the Company reserves the right to have access to these areas and to such property at any

time, without advance notice to any employee. Therefore, employees should not expect that such property would be treated as private and personal to the employee. Likewise, electronic mail and voicemail are also company property and are to be used only for business purposes. Internet accounts are also to be used only for company business. The Company reserves the right to inspect, monitor and have access to company computers, electronic mail, voicemail messages and Internet communications. (Page 39 Personal Property & Privacy Policy)

Employees should refrain from using company communications service and equipment for personal use. Employees should exercise care so that no personal correspondence ever appears to be an official communication of the Company. (Page 42 Personal Use of Company Equipment)

Copyrighted materials, trade secrets, proprietary financial information, or similar materials may not be transmitted (uploaded) or received (downloaded) by employees without prior authorization. (Page 42 Copyright Issues)

All Company communication services and equipment are the sole property of the Company. (Page 43 No Expectation of Privacy)

Improper use includes, but is not limited to, any misuse as described in this policy as well as: …. use for personal gain…. or attempts to sabotage company files. (Page 44 Improper Use/Violation of Communications Policy)

Resignation is a voluntary act initiated by the employee to end employment with the Company. Employees should provide a minimum of two (2) weeks notice prior to resignation. (Page 48 Voluntary Resignation)

All company property must be returned at the time of separation including, but not limited to keys, PCs, laptops, cell phones, and identification cards. (Page 49 Return of Property)

59. The Brown & Brown Information Technology Guidelines (ITGs) are incorporated into the Brown & Brown Employee Handbook by reference. The November 2012 ITGs include the following rules and standards, which Defendant Mark Ouimette violated by his wrongful and tortious acts and omissions set forth in this Complaint:

> All email accounts maintained on our email systems are property of Brown & Brown Insurance. (ITG 18, Email, Email Accounts)
>
> Protection of Confidential and Proprietary Information. Brown & Brown employees and Company representatives shall not disclose information considered confidential or proprietary, including Company, customer, partner, supplier or any other third party information as well as information of a technical, strategic, financial, legal or commercial nature. (ITG 24, Business Communications Guidelines)
>
> All contents of the Brown & Brown's IT resources and communications systems are the property of the company. (ITG 24, Business Communications Guidelines, No Expectation of Privacy)

60. Breach of Duties of Employee and Fiduciary: On and before November 5, 2014, Mark Ouimette had a 'confidential relationship' with his employer Beecher Carlson within the meaning of O.C.G.A. §23-2-58, which states:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling authority over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, *etc*.

As an employee, officer, and managing director of Beecher Carlson, Mark Ouimette betrayed his confidential relationship with Beecher Carlson; and Mark Ouimette owed Beecher Carlson a fiduciary duty and a duty of good faith, fidelity, and loyalty which he tortiously and wrongfully breached by his herein described breaches of his 2003 Employment Contract, and the other wrongful acts and omissions described herein.

61. Tortious Inducement: By cooperating with, assisting, and conspiring with Michael Stern and Stern Risk Partners LLC to develop the concept, the business methods, the market strategies, and the operations of Stern Risk Partners while Stern (and Ouimette) were still employees of Beecher Carlson, and by conspiring with Michael Stern to destroy and delete Beecher Carlson records and data, Mark Ouimette and Stern Risk Partners LLC tortiously induced Michael Stern's above described breaches of Paragraphs 5 and 6 of Stern's April 2, 2004 Non-Solicitation and Confidentiality Agreement and his fiduciary duty and his duties of good faith, fidelity, and loyalty owed to Beecher Carlson.

BRENDAN HEALY IS RECRUITED TO THE CONSPIRACY

62. On or about June 13, 2005, Brendan Healy entered into and signed an Employment Contract with his then employer RiskCap, Inc. A true and correct

copy of the Employment Agreement, bearing Brendan Healy's notarized signature, is attached hereto in Exhibit "C". At the time of Brendan Healy's hiring, RiskCap, Inc. was owned by Beecher Carlson.

63. In March, 2012, RiskCap, Inc. was merged into Plaintiff BCIS. Therefore BCIS is the employer party to and successor of RiskCap, Inc. with respect to the 2005 Employment Contract signed by Brendan Healy.

64. Plaintiff BCIS is also entitled to enforce the 2005 Employment Contract signed by Brendan Healy as the successor to RiskCap, Inc. by virtue of paragraph 8 of that Employment Contract, which states:

> Successors - This Agreement shall be binding on the parties' hereto and their heirs, successors, and assignees, and shall continue and remain in full force and effect after termination of employment of Healy.

65. Brendan Healy's initial job position with RiskCap, Inc. was Risk Analyst, and he was responsible for captive design and formation, insurance placements for excess and reinsurance, and ongoing management and regulatory compliance. In 2012, after he became an employee of BCIS due to the merger of RiskCap into BCIS, Healy became Assistant Vice-President and was then responsible for captive design and formation, insurance brokerage, and captive insurance program administration.

66. At the time of his resignation on February 16, 2015, Brendan Healy was employed by Plaintiff BCIS as "Vice-President - Captive Consulting", a position to which he was promoted in January 2015 and given a pay raise specifically because he (falsely) represented to Beecher Carlson that he was a loyal employee and would not join Stern Risk Partners LLC.

67. Stern and Ouimette Recruit Brendan Healy to join the Conspiracy, become an employee of Stern Risk Partners, misappropriate Beecher Carlson's confidential and trade secret information, and destroy Beecher Carlson data. Upon information and belief, Mark Ouimette, Michael Stern, and Stern Risk Partners recruited Brendan Healy to the conspiracy and he, in fact, joined the conspiracy before November 5, 2014, but remained employed at Beecher Carlson until February 16, 2015, to act as an undercover spy for the benefit of the conspirators, including Stern Risk Partners.

68. Brendan Healy Absconds With His Beecher Carlson Cell Phone and All Its Data: Although Brendan Healy resigned his employment with Beecher Carlson on or about February 16, 2015 in order to take employment with Stern Risk Partners, and in the course and scope of the conspiracy among him and Michael Stern, Mark Ouimette, and Stern Risk Partners, Brendan Healy did not return to Beecher Carlson its cell phone, thereby purposely depriving Beecher

Carlson of its tangible property and its data and business records which can only be accessed thereon.

69. Brendan Healy Wrongfully Accessed Beecher Carlson's Computer Data Systems and Misappropriated Beecher Carlson's Confidential and Trade Secret Information: As an example of the espionage and theft of confidential and trade secret information engaged in by Brendan Healy, on or about February 9, 2016, Brendan Healy, while still an employee of BCHI, but while actually operating in the course and scope of his agreement to join Stern Risk Partners and as part of the conspiracy described herein, accessed the AMS 360 Customer Center data system of Beecher Carlson and wrongfully stole information about the insurance program of Beecher Carlson customer Cachet Homes (Perimeter Insurance Co.)

70. Upon information and belief, Brendan Healy downloaded and copied, without authorization or permission, trade secret and confidential Beecher Carlson data, including sensitive and confidential customer data, in the course and scope of the conspiracy with Stern Risk Partners, Michael Stern, and Mark Ouimette described herein, and without authorization from Beecher Carlson, on at least the following occasions and by the following means:

(a) on February 4, 2015 at 4:44 pm, just twelve days before his surreptitious resignation to join Stern Risk Partners, Brendan Healy attached a USB drive (Generic Flash Disk USB Device, Serial # 736DABD3&0) to his Beecher Carlson computer;

(b) on February 11, 2015 at 5:56 pm, just four days before his surreptitious resignation to join Stern Risk Partners, Brendan Healy, attached a USB drive (Verbatim STORE N GO USB Device, Serial #122500000014014F&0) to his Beecher Carlson computer; and

(c) on Friday, February 13, 2015, just three days before his surreptitious resignation to join Stern Risk Partners, Brendan Healy, attached two USB drives (USB Flash Disk USB Device, Serial # FA823B15087216C6&0 and USB Flash Disk USB Device, Serial # 122500000014014F&0) (at 9:52 am and 1:20 pm respectively) to his Beecher Carlson computer.

AUBRIE DESCOMBES IS RECRUITED TO THE CONSPIRACY

71. Aubrie DesCombes is believed to be an individual residing in Colorado. She was employed on or about June 3, 2013 as Captive Program

Administrator by Plaintiff BCIS until her resignation on February 15, 2015, effective as of February 16, 2015.

72. On or about May 13, 2013, Aubrie DesCombes signed a Non-Solicitation And Confidentiality Agreement with BCIS, which was accepted and signed by BCIS on June 6, 2013. A true and correct copy of the Non-Solicitation And Confidentiality Agreement, bearing Aubrie DesCombes' signature, is attached hereto in Exhibit "D".

73. Defendants Michael Stern, Mark Ouimette, and Stern Risk Partners recruited Aubrie DesCombes to the conspiracy described above, and wrongfully induced Aubrie DesCombes to breach her Non-Solicitation And Confidentiality Agreement, in at least the following ways:

(a) Breach of Extent of Service clause: Aubrie DesCombes breached the Extent of Service clause in Paragraph 5 (which is worded identically to the Extent of Service clause in Michael Stern's Non-Solicitation And Confidentiality Agreement quoted above) by the wrongful conduct described in this Complaint engaged in by her while still a Beecher Carlson employee, by failing to devote her full business time, best efforts, and business judgement, skill and knowledge to the advancement

of Beecher Carlson's interests and to the discharge of her duties and responsibilities under her agreement.

(b) Wrongful Solicitation of Beecher Carlson Customers: Aubrie DesCombes breached Paragraph 6(e) (which is worded identically to the same clause in Michael Stern's Non-Solicitation And Confidentiality Agreement quoted above) solicited directly or indirectly Beecher Carlson customers during her employment with Beecher Carlson and within two years after her resignation on February 15, 2015, for the purpose of selling that customer the insurance brokerage, risk management, or related consulting services that DesCombes provided to that customer on behalf of Beecher Carlson.

(c) Breach of Disclosure of Agreement Clause: By failing to disclose to Beecher Carlson her employment by or affiliation with Stern Risk Partners, Aubrie DesCombes breached Paragraph 6(h), which states:

> Disclosure of Agreement. During the Restricted Term, I agree to immediately inform Employer of any employment or affiliation by me with any company other than Employer that provides Services…..

DEFENDANTS SEND A MINION TO DO THEIR DIRTY WORK:

74. On or about February 25, 2015, Bardo Arroyave (an employee of Stern Risk Partners residing and working in the Atlanta area) telephoned Cheryl Jones (an underwriter and account administrator) at her Beecher Carlson office in Atlanta. (Jones is employed by OnPoint Underwriting, Inc., a sister company of Beecher Carlson.) In the phone call, Arroyave attempted to recruit Cheryl Jones into "moving" a Beecher Carlson client, Security America, to Stern Risk Partners. Arroyave promised her that if she moved Security America's business from Beecher Carlson to Stern Risk Partners, she would be given a job at Stern Risk Partners and she could work from home. Bardo Arroyave formerly worked for Beecher Carlson as Director of Business Management from September 2004 to February of 2008. Jones worked for Bardo Arroyave when he was employed at Beecher Carlson.

75. On or about March 4, 2015, Bardo Arroyave again called Cheryl Jones at her Beecher Carlson office in Atlanta. Arroyave repeated the same pitch he made in his first call to Jones, as described above. Jones asked him "Are you serious?" He replied "Dead serious". Not satisfied with recruiting Jones to steal Beecher Carlson's business while still an employee of Beecher Carlson, Arroyave attempted to lure Jones into industrial espionage: He asked Jones to divulge details

about Beecher Carlson's relationship with its client Marsh & McLennan (which manages the captive insurer portion of the insurance program offered by Beecher Carlson's customer, Security America). Arroyave asked further details about the program, how many persons took to administer the program, what the relationship was like between Richard Poling (another Beecher Carlson employee) and Marsh. Arroyave knew his contacts with Jones were unlawful because he also attempted to get Jones to agree to a cover story: "Here's how we're gonna play it, I'll say you contacted me and approached us about the program."

76. On or about March 5, 2015, Bardo Arroyave made a third call to Cheryl Jones at her Beecher Carlson office in Atlanta to solicit her to steal Beecher Carlson customers and engage in espionage for Stern Risk Partners. Jones asked Arroyave to stop calling her.

DEFENDANTS CONTINUE TO WRONGFULLY SOLICIT BEECHER CARLSON CUSTOMERS AND MISUSE BEECHER CARLSON CONFIDENTIAL INFORMATION:

77. The Defendants intend to and are continuing to wrongfully solicit Beecher Carlson customers and employees and misuse trade secrets and confidential information which they misappropriated from Beecher Carlson, as shown by the actions of Bardo Arroyave described above and the following additional recent examples:

78. On and about the date of January 20, 2015, Michael Stern and Mark Ouimette attended the NMHC Annual Conference in Palm Springs, CA, which was held from January 19, 2015 to January 22, 2015. On January 20th, Michael Stern and Mark Ouimette approached a table occupied by Beecher Carlson employees Clay Collins, Will Ross and Bob Lane, on the outdoor deck of Adobe Grill, a restaurant at the LaQuinta Resort & Club. Both Stern and Ouimette had their NMHC event affiliation badges turned inward, so the names could not be read. The badges were orange in color, which was the designated color for a company which is a multifamily property owner or manager. A white badge color would have signified a vendor, such as Beecher Carlson. Bob Lane turned around the badge hanging from Ouimette's neck lanyard, which revealed Ouimette's first and last name and GoldOller Real Estate Investments as the company name on his orange badge. Stern then held his badge up, revealing the same - his name and GoldOller Real Estate Investments.

79. GoldOller Real Estate Investments was a customer of Beecher Carlson which was wrongfully solicited by and has been taken from Beecher Carlson by Defendants Stern Risk Partners, Michael Stern, and Mark Ouimette.

80. Upon information and belief, GoldOller Real Estate Investments made a capital investment or loan to Stern Risk Partners or its principals to aid in its formation and initial activities.

81. During the week of February 16, 2015, Mark Ouimette and Kirk Mooneyham (another Stern Risk Partners employee) took two Golden Insurance Company executives (Jerry Thompson, President, and Chris McAuley, CFO) out to lunch. (Golden Insurance Company is a risk retention group and its largest shareholder is StrucSure Risk Management Group; Thompson and McAuley are also President and CFO respectively of StrucSure Risk Management Group.) Stern Risk Partners approached Golden Insurance with a proposal to take over Golden Insurance's program/management from a Beecher Carlson subsidiary. In so doing, Mark Ouimette wrongfully used Beecher Carlson's confidential information and trade secrets. In so doing, Mark Ouimette breached Paragraphs 6 and 7 of his 2003 Employment Contract. Michael Stern and Stern Risk Partners wrongfully induced Mark Ouimette into these breaches of his 2003 Employment Contract.

DEFENDANTS ARE UNLAWFULLY AND WRONGFULLY TRADING ON AND BENEFITTING FROM BEECHER CARLSON'S GOODWILL, TRADE SECRETS, CONFIDENTIAL & PROPRIETARY INFORMATION AND PROTECTED COMPUTER INFORMATION

82. Beecher Carlson took reasonable and appropriate steps to protect its trade secrets and confidential information.

83. Beecher Carlson has developed its customer relationships, its practices and methods of business, its confidential and trade secret information and information systems, and its insurance brokerage expertise at great expense over many years, all of which give Beecher Carlson a competitive advantage in the marketplace.

84. Defendants' wrongful and tortious acts and omissions detailed in this Complaint were intended to and/or did have the effect of trading on Beecher Carlson's goodwill and its competitive advantages in the marketplace, for the benefit of Defendants and to the detriment of Beecher Carlson.

## CAUSES OF ACTION

85. The allegations of all preceding paragraphs are incorporated in and made a part of all Counts and Causes of Action asserted below.

## COUNT I

86. Breaches of Contracts Against Stern and Ouimette: By the acts and omissions alleged above, Michael Stern wrongfully breached his April 2, 2004

Non-Solicitation And Confidentiality Agreement and caused damages, injuries, and irreparable harm to Beecher Carlson. By the acts and omissions alleged above, Mark Ouimette wrongfully breached his 2003 Employment Contract and caused damages, injuries, and irreparable harm to Beecher Carlson.

**COUNT II**

87. Wrongful Inducement of Breach of and Tortious Interference with Existing Contracts Against Stern Risk Partners, Stern, and Ouimette: By the acts and omissions alleged above, Michael Stern, Mark Ouimette, and Stern Risk Partners tortiously interfered with each of the following contracts and wrongfully induced (a) Michael Stern to breach his April 2, 2004 Non-Solicitation And Confidentiality Agreement, (b) Mark Ouimette to breach his 2003 Employment Agreement, (c) Brendan Healy to breach his 2005 Employment Contract, and (d) Aubrie DesCombes to breach her 2013 Non-Solicitation And Confidentiality Agreement with BCIS; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

**COUNT III**

88. Misappropriation of Confidential Information and Trade Secrets Against Stern Risk Partners, Stern, and Ouimette: By wrongfully misappropriating Beecher Carlson's information, trade secrets, data, confidential information, and

proprietary information as alleged above, Stern Risk Partners, Stern, and Ouimette wrongfully misappropriated Beecher Carlson's information, trade secrets, data, confidential information, and proprietary information to their own use and to that of the conspiracy which they formed and joined; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

**COUNT IV**

89. Conversion Against Stern Risk Partners, Stern, and Ouimette: By causing Brendan Healy to wrongfully retain Beecher Carlson's cell phone and its data, and by wrongfully misappropriating Beecher Carlson's information, trade secrets, confidential information, and proprietary information as alleged above, Stern Risk Partners, Stern, and Ouimette wrongfully converted Beecher Carlson's property to their own use and to that of the conspiracy which they formed and joined; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

**COUNT V**

90. Breach of Fiduciary Duty and Duty of Loyalty Against Stern, Ouimette, and Stern Risk Partners and Wrongful Inducement: By the acts and omissions alleged above, Michael Stern and Mark Ouimette breached and induced each other to breach their 'confidential relationship' with their employer Beecher

Carlson within the meaning of O.C.G.A. §23-2-58, and the fiduciary duties and duties of good faith, fidelity, and loyalty which they owed to Beecher Carlson; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

91. Stern, Ouimette, and Stern Risk Partners joined together in a conspiracy and within the course and scope of that conspiracy, they induced Stern, Ouimette, Brendan Healy, and Aubrie DesCombes to breach their 'confidential relationship' with their employer Beecher Carlson within the meaning of O.C.G.A. §23-2-58, and the fiduciary duties and duties of good faith, fidelity, and loyalty which they owed to Beecher Carlson; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

**COUNT VI**

92. Unfair Competition Against Stern Risk Partners, Stern, and Ouimette: By the many wrongful acts and omissions set forth above, and by entering into a conspiracy also described above, Stern Risk Partners, Stern, and Ouimette engaged in unfair competition against Beecher Carlson; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

**COUNT VII**

93. Civil Conspiracy Against Stern Risk Partners, Stern, and Ouimette: Stern, Ouimette, and Stern Risk Partners joined together in an unlawful conspiracy

as set forth above, and within the course and scope of that conspiracy, they committed the misconduct, the many wrongs, breaches of duties, breaches of contracts, and the statutory violations described above; thereby causing damages, injuries, and irreparable harm to Beecher Carlson.

## COUNT VIII

94. The Georgia Trade Secrets Act: The information which Defendants misappropriated was developed by and/or for Beecher Carlson through the expenditure of substantial amounts of time, money, intellectual capital, and energy; was not commonly known by or available to the public; provided Beecher Carlson with a competitive advantage in its industry; and constituted trade secrets under the Georgia Trade Secrets Act, codified in O.C.G.A. § 10-1-761 *et seq*., and alternatively under Colorado law. The said misappropriated information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. Beecher Carlson has a property right and a protectable interest in its trade secrets and confidential and proprietary information.

95. Beecher Carlson took reasonable and practical measures to maintain the secrecy and confidentiality of its trade secrets and confidential information,

including using electronic and physical security measures to protect such information, and by requiring its employees to agree to keep such information confidential. Despite these measures, Defendants misappropriated Beecher Carlson's trade secrets.

96. Defendants acquired Beecher Carlson's information set forth above: (1) under circumstances giving rise to a duty to maintain the secrecy of such information or limit its use; or (2) by improper means including the breach of a confidential relationship or other duty to maintain secrecy or limit its use, conversion and/or other improper means. The taking, retention and use of Beecher Carlson's property by Defendants constitute a misappropriation of Beecher Carlson's trade secrets, confidential and proprietary information.

97. As a proximate result of Defendants' misappropriation of Beecher Carlson's trade secrets, Beecher Carlson has suffered direct and consequential harm and is entitled to monetary damages in an amount to be established at trial. Defendants' misappropriations were willful and malicious; therefore, Beecher Carlson is also entitled to punitive damages and attorneys' fees.

**COUNT IX**

98. <u>The Georgia Computer Systems Protection Act</u>: The Georgia Computer Systems Protection Act is codified at O.C.G.A. §16-9-90, *et seq.*

Although O.C.G.A. §16-9-93 codifies certain crimes, it also provides a civil remedy for the following crimes:

> “(a) Computer theft. Any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of:
>
> > (1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession;
> >
> > (2) Obtaining property by any deceitful means or artful practice; or
> >
> > (3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property
>
> shall be guilty of the crime of computer theft.
>
> (b) Computer Trespass. Any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of:
>
> > (1) Deleting or in any way removing, either temporarily or permanently, any computer program or data from a computer or computer network;
> >
> > (2) Obstructing, interrupting, or in any way interfering with the use of a computer program or data; or
> >
> > (3) Altering, damaging, or in any way causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists
>
> shall be guilty of the crime of computer trespass.

(c) Computer Invasion of Privacy. Any person who uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy."

99. By the acts and omissions described above, Michael Stern, Mark Ouimette, and Stern Risk Partners LLC conspired together and with others, including Brendan Healy, to commit and did, in fact, commit the Georgia crimes of computer theft, computer trespass, and computer invasion of privacy as defined by O.C.G.A. §16-9-93. BCHI and BCIS were victims of the said crimes, have suffered damages and injuries as a result of the said criminal acts and are entitled to the civil remedies provided by O.C.G.A. §16-9-93 against Michael Stern, Mark Ouimette, and Stern Risk Partners LLC, individually and jointly.

100. The civil remedy provided by The Georgia Computer Systems Protection Act (in O.C.G.A. §16-9-93) includes recovery for any damages sustained (which includes loss of profits and victim expenditure) and the costs of suit, as stated in the following quotation from the statute:

"(g) Civil Relief; Damages.

(1) Any person whose property or person is injured by reason of a violation of any provision of this article may sue therefor and recover for any damages sustained and the costs of suit. Without limiting the generality of the term, "damages" shall include loss of profits and victim expenditure.

> ………..
> (3) The provisions of this article shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law."

101. BCHI and BCIS have sustained damages within the meaning of O.C.G.A. §16-9-93, which damages were proximately caused by Defendants' individual and joint violations of The Georgia Computer Systems Protection Act.

**COUNT X**

102. Federal Computer Fraud and Abuse Act: Although the Federal Computer Fraud and Abuse Act, 18 U.S.C. §1030, *et seq.* ("hereafter CFAA"), codifies certain federal crimes, it also provides civil remedies and establishes a basis for the exercise of federal question subject matter jurisdiction in civil actions such as this civil action.

103. The personal computers, server computers, and cell phone devices described in this Complaint were all "protected computers" within the meaning of CFAA because each of them was used in or affecting interstate or foreign commerce or communication and each of them was an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, or a data storage facility or communications facility directly related to or operating in conjunction with such device.

104. CFAA Violation - Accessing a Protected Computer And Causing Damage and Loss or Recklessly Causing Damage: By intentionally and without authorization accessing Beecher Carlson's 'protected computers'(including cell phones and servers) as described above, and causing damage and loss to Beecher Carlson or recklessly causing damage to Beecher Carlson, Defendants violated both CFAA §1030(a)(5)(B) and (C) which provide that: 'Whoever intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss or recklessly causes damage shall be punished as provided in subsection (c) of this section.' [1] Therefore all Defendants violated CFAA §1030(a)(5)(B) and (C) and since all Defendants committed such acts within the course and scope of the conspiracy amongst themselves and Brendan Healy and Aubrie DesCombes, all Defendants are also liable under CFAA §1030(a)(6) which states "Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section."

105. Destruction of Data CFAA Violation: By intentionally and knowingly transmitting a code or command to wipe his cell phone, a 'protected computer' which belonged to Beecher Carlson, thereby causing damage to and

[1] CFAA §1030(a)(5) (B) and (C) are combined above for clarity. They appear separately in the statute's actual text.

destruction of the data thereon without the authorization of Beecher Carlson, Defendant Michael Stern violated CFAA §1030(a)(5)(A) which states: "Whoever knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer shall be punished as provided in subsection (c) of this section." In so doing, Michael Stern acted within the course and scope of his conspiracy with and with the permission and authority of Stern Risk Partners, Mark Ouimette, and Brendan Healy; and therefore all Defendants violated CFAA §1030(a)(5)(A) and CFAA §1030(a)(6) which states "Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section."

106. Obtaining Information from Protected Computers CFAA Violation: Defendants Michael Stern and Mark Ouimette (individually and in the course and scope of a conspiracy among themselves and Stern Risk Partners, Brendan Healy, and Aubrie DesCombes) either directly themselves, or by directing others to do so, intentionally accessed 'protected computers' assigned them by Beecher Carlson and/or 'protected computers' used by Beecher Carlson for storage of its data, information, and databases, without authorization or exceeding authorized access, and thereby obtained information from such protected computers. Therefore all

Defendants violated CFAA §1030(a)(2)(C) which states: "Whoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer shall be punished as provided in subsection (c) of this section" and CFAA §1030(a)(6) which states "Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section."

107. Furthering Intended Fraud CFAA Violation: Defendants Michael Stern and Mark Ouimette (individually and in the course and scope of a conspiracy among themselves and Stern Risk Partners, Brendan Healy, and Aubrie DesCombes) either directly themselves, or by directing others to do so, knowingly and with intent to defraud, accessed protected computers without authorization, or exceeding authorized access, and by means of such conduct furthering an intended fraud and obtaining things of value, exceeding more than $5,000 in any one-year period; *inter alia*, by defrauding Beecher Carlson into retaining the services of Brendan Healy, promoting Brendan Healy, giving a pay raise to Brendan Healy, allowing Brendan Healy access or continued access to Beecher Carlson's 'protected computers', and sharing confidential information with Brendan Healy, all while Brendan Healy was already a member of the conspiracy among himself, Michael Stern, Mark Ouimette, Stern Risk Partners, and later, Aubrie DesCombes.

Therefore all Defendants violated CFAA §1030(a)(4) which states: "Whoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value… shall be punished as provided in subsection (c) of this section" and CFAA §1030(a)(6) which states "Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section."

108. The Beecher Carlson information and data wrongfully wiped, deleted, accessed, copied, and otherwise misused by Defendants in violation of CFAA resided on 'protected computers'. Each of those 'protected computers' were used in interstate commerce and communications, and each was a portal to and used to access the internet or other means of interstate commerce and communications such as cell phone carrier networks. The Defendants lacked any authority or exceeded any authority they may have had to access that data and information. The loss caused to BCHI by each Defendants' violations of CFAA exceed $5,000.00 in any one year, for instance, BCHI's losses from each Defendant's CFAA violations exceeded $5,000.00 in 2014. The loss caused to BCIS by each Defendants' violations of CFAA exceed $5,000.00 in any one year, for instance, BCIS's losses from each Defendant's CFAA violations exceeded $5,000.00 in

2014. Upon information and belief, the damage caused by Defendants' and their conspiracy's violations of CFAA affected ten or more protected computers during any one year period, including, by way of example, from August, 2014 to the present.

## COUNT XI

109. Stubborn Litigiousness: Defendants have acted in bad faith and been stubbornly litigious and have caused Beecher Carlson unnecessary trouble and expense. Therefore, pursuant to O.C.G.A. §13-6-11, Beecher Carlson is entitled to recovery of expenses of litigation, including but not limited to its reasonable attorneys' fees.

## DAMAGES

110. Lost Profits and Disgorgement of Profits: Beecher Carlson is entitled to an award against all Defendants jointly and severally for all its lost profits, for disgorgement of pay and emoluments of employment given to Defendants Michael Stern and Mark Ouimette by Stern Risk Partners, and for disgorgement of Defendant Stern Risk Partners' ill-gotten profits from revenues derived in the past, present, and future from Beecher Carlson customers wrongfully solicited and taken by Defendants Stern Risk Partners LLC, Mark Ouimette, and Michael Stern, or

others in conspiracy with them or at their direction. Such customers include, but are not limited to:

(a) Asset Essentials Holdings LLC,
(b) AppFolio, Inc.,
(c) Terra Mar Ins. Co. (AppFolio, Inc.),
(d) Embassy Insurance Corporation (Camelot Homes),
(e) Gulf Atlantic Casualty Ins. Co.,
(f) South States Ins. Co. (New South Construction Co.),
(g) Perimeter Ins. Co. (Cachet Homes),
(h) Remington Ins. Co., and
(i) GoldOller Real Estate Investments.

111. Replacement Cost of Phones: Beecher Carlson is entitled an award of the replacement cost of (a) its phone issued to Mark Ouimette which cannot be used because it was password locked by Ouimette at the instructions of and as part of the conspiracy with Michael Stern and Stern Risk Partners LLC and he has not divulged the password to Beecher Carlson, and (b) its phone issued to Brendan Healy with which Healy absconded at the instructions of and/or in the course and scope of the conspiracy among him and Mark Ouimette, Michael Stern, and Stern Risk Partners LLC.

112. Forensic Costs and Damages: Beecher Carlson is entitled to an award of the cost of forensic examination and recovery of its devices and computers wrongfully taken or wiped, or from which data or information was wrongfully deleted or passwords wrongfully withheld, and the cost of replacing such

information and data and/or the loss of profits and lost opportunities caused by the destruction or withholding of such data and information.

113. Damages for Failure to Give Notice: Beecher Carlson is entitled to damages for Mark Ouimette's failure to give 30 days' notice of his resignation in the amount of his salary and benefits for such period of time, and/or the loss of profits and lost opportunities caused by his failure to give the notice required by his Employment Contract.

114. Failure to Give Notice Damages, Including Attorney Fees, Costs, Forensic Costs, etc.: Had Mark Ouimette given the 30 days' notice of his resignation required by his Employment Contract, had Mark Ouimette not breached the Sole Employment clause in his 2003 Employment Contract, had Michael Stern informed his employer as required under the Disclosure of Agreement clause and had Michael Stern not breached the Extent of Service clause in his April 2, 2004 Non-Solicitation And Confidentiality Agreement, Beecher Carlson would have learned earlier of the unlawful conspiracy among Mark Ouimette, Michael Stern, Stern Risk Partners, Brendan Healy, and Aubrie DesCombes, and would have been able to stop or end the unlawful conspiracy with appropriate warnings to the parties involved or by seeking injunctive relief. As a result of the above-described breaches of contract by Stern and Ouimette, Beecher

Carlson has incurred attorney fees, forensic examination costs, and other costs, past and future lost profits and past and future lost business opportunities, for which it is entitled to an award of damages against Mark Ouimette, Michael Stern, and Stern Risk Partners, jointly and severally.

115. Ownership of Stern Risk Partners or All Its Assets: By virtue of their breaches individually, in conspiracy with each other, and/or by unlawfully inducing each other to breach their employment related agreements and duties and obligations to Beecher Carlson, including Paragraph 6(d) (Ownership of Inventions & Developments) of Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement, Paragraph 5 (Extent of Service) of Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement, and Paragraph 2 (Sole Employment) of Ouimette's 2003 Employment Contract, Beecher Carlson is entitled to an award, order, or injunction transferring ownership of Stern Risk Partners, all of the ownership stock and shares of Stern Risk Partners, or all of Stern Risk Partner's assets to Beecher Carlson.

116. Damages under the Georgia Trade Secrets Act: Beecher Carlson is entitled to an award of damages, punitive damages, attorneys' fees, and litigation costs based upon Defendants' violations of the Georgia Trade Secrets Act.

117. Damages Under The Georgia Computer Systems Protection Act: Beecher Carlson is entitled to an award of its costs of suit and also its damages sustained and proximately caused by the Defendants' violations of The Georgia Computer Systems Protection Act described above, including loss of profits and victim expenditure. The civil remedy provided by The Georgia Computer Systems Protection Act (in O.C.G.A. §16-9-93) includes recovery for any damages sustained (which includes loss of profits and victim expenditure) and the costs of suit, as stated in the following quotation from the statute:

> "(g) Civil Relief; Damages.
>
> (1) Any person whose property or person is injured by reason of a violation of any provision of this article may sue therefor and recover for any damages sustained and the costs of suit. Without limiting the generality of the term, "damages" shall include loss of profits and victim expenditure.
>
> ………..
>
> (3) The provisions of this article shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law."

118. Stubborn Litigiousness: Defendants have acted in bad faith and been stubbornly litigious and have caused Beecher Carlson unnecessary trouble and expense. Therefore, pursuant to O.C.G.A. §13-6-11, Beecher Carlson is entitled to recovery of expenses of litigation, including but not limited to its reasonable attorneys' fees.

119. CFAA Damages: Beecher Carlson is entitled to an award of its compensatory damages (including economic damages) and equitable relief under the Federal Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030(g) which states that:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief….

**EXEMPLARY AND PUNITIVE DAMAGES**

120. BCHI and BCIS are entitled to an award against all Defendants jointly and severally, of punitive damages, exemplary damages, and any enhanced damages allowed by law or authorized by statute, rule, or regulation arising from the misconduct, statutory violations, torts, and breaches of contract set forth above.

**ATTORNEYS' FEES, COSTS, AND INTEREST**

121. BCHI and BCIS are entitled to an award of court costs and pre-judgment and post-judgment interest at the highest rate permitted by law or rule on the amount of any judgment or award granted herein against the Defendants in this civil action.

122. Defendants have acted in bad faith and been stubbornly litigious and have caused Beecher Carlson unnecessary trouble and expense. Therefore,

pursuant to O.C.G.A. §13-6-11, Beecher Carlson is entitled to recovery of expenses of litigation, including but not limited to its reasonable attorneys' fees.

123. Beecher Carlson is entitled to an award of damages, punitive damages, attorneys' fees, and litigation costs based upon Defendants' violations of the Georgia Trade Secrets Act.

124. The Georgia Computer Systems Protection Act, in O.C.G.A. §16-9-93, provides a civil remedy which includes costs of suit, and therefore Beecher Carlson is entitled to an award of costs of suit against the Defendants thereunder.

125. Beecher Carlson is entitled to an award of its damages, including attorney fees, litigation expenses, forensic expenses, and court costs under the Federal Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030(g) which provides for recovery of compensatory damages (including economic damages) and equitable relief, and states that:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief….

126. Beecher Carlson is entitled to an award of interest, attorney fees, and costs against Mark Ouimette pursuant to Paragraph 7 of his Employment Contract which states:

> … any breach of the terms in this provision regarding competition is a material breach of this agreement, from which Ouimette may be enjoined and for which Ouimette shall also pay to [Employer] all damages (including, but not limited to, compensatory, incidental, consequential and lost profits damages), which arise from any such a breach, together with interest, costs and attorney's fees to collect such damages.

## INJUNCTIVE RELIEF & IRREPARABLE HARM

127. The wrongful acts and omissions of Michael Stern, Mark Ouimette, and Stern Risk Partners, as described above, have caused irreparable harm to BCHI and BCIS, and will continue to cause irreparable harm to BCHI and BCIS if not enjoined by this Court. Damages will not provide an adequate remedy to BCHI and BCIS for such wrongful acts and omissions.

128. Michael Stern agreed that money damages would be an inadequate remedy for any breach by him of Section 6 of his April 2, 2004 Non-Solicitation And Confidentiality Agreement; and he further agreed that Beecher Carlson would be entitled to an injunction or other appropriate relief to restrain an breach or threatened breach by him of Section 6. Michael Stern waived the necessity of posting bond for such injunctive relief. Section 6(k) of Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement states:

> Injunction. I agree that it would be difficult to measure any damages caused to the Employer which might result from any breach by me of the promises set forth in this Section 6, and that in any event money

> damages would be an inadequate remedy for any such breach. Accordingly, I agree that if I breach, or threaten to breach, any portion of Section 6 of this Agreement, the Employer shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to the Employer and without the necessity of posting bond.

129. Mark Ouimette agreed that any breach by him of Paragraph 7 of his 2003 Employment is a "material breach" of his agreement and that he could be enjoined by the Court, in addition to any award of damages. Paragraph 7 of his 2003 Employment includes this quote:

> The parties hereby stipulate that the foregoing matters pertaining to competition and gravely impact the effective and successful conduct of the business of [RiskCap] and affect its reputation and good will, and that any breach of the terms in this provision regarding competition is a material breach of this agreement, from which Ouimette may be enjoined and for which Ouimette shall also pay to [RiskCap] all damages (including, but not limited to, compensatory, incidental, consequential and lost profits damages), which arise from any such a breach, together with interest, costs and attorney's fees to collect such damages.

130. Beecher Carlson is also entitled to equitable relief under the Federal Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030(g)) which expressly provides for recovery of not only compensatory damages (including economic damages), but also equitable relief, and states that:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain

> compensatory damages and injunctive relief or other equitable relief….

**PRAYER FOR RELIEF**

131. That Beecher Carlson be granted interim pre-trial equitable relief, such as that Defendants be enjoined, by way of temporary restraining order and preliminary injunction, and thereafter permanently, from retaining, using or disclosing any of Beecher Carlson's confidential information, trade secrets, property, or information obtained in violation of CFAA or The Georgia Computer Systems Protection Act; that Defendants be directed to immediately return to Beecher Carlson all of its documents, data, information, and property in any of their possession, custody or control; and that Defendants be enjoined from soliciting Beecher Carlson employees or Beecher Carlson clients and customers within the prohibitions of Paragraphs 6(e) and (f) Michael Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement, Paragraph 7 of Mark Ouimette's 2003 Employment Contract, and the corresponding provisions of the above-described agreements of Brendan Healy and Aubrie DesCombes; or which were obtained in whole or in part by use of information, confidential information, or trade secrets of Beecher Carlson known to or wrongfully obtained by Defendants or by employees of Stern Risk Partners or in violation of CFAA or The Georgia Computer Systems Protection Act;

132. That Defendants be ordered and enjoined to promptly produce their computers, cell phones, USB drives and/or all data storage devices in any of their possession, custody, and/or control for imaging and forensic inspection, and be ordered not to remove, destroy, alter or modify any files or data on any of those devices until the forensic investigation is completed;

133. That Defendants be enjoined from soliciting Beecher Carlson employees and Beecher Carlson clients and customers within the prohibitions of Paragraphs 6(e) and (f) of Michael Stern's April 2, 2004 Non-Solicitation And Confidentiality Agreement, Paragraph 7 of Mark Ouimette's 2003 Employment Contract, and the corresponding provisions of the above-described agreements of Brendan Healy and Aubrie DesCombes; or which were obtained in whole or in part by use of information, confidential information, or trade secrets of Beecher Carlson known to or wrongfully obtained by Defendants or by employees of Stern Risk Partners or in violation of CFAA or The Georgia Computer Systems Protection Act; or inducing breach of any of the agreements of Michael Stern, Mark Ouimette, Brendan Healy, and Aubrie DesCombes described above

134. That Plaintiffs be granted all other appropriate equitable relief including transfer of the ownership of Stern Risk Partners LLC or all its assets to them,

135. That Plaintiffs be granted judgment against Defendants jointly and severally for all damages caused by their misconduct set forth above.

136. That Plaintiffs be granted judgment against Defendants jointly and severally for punitive and exemplary damages, attorneys' fees, and costs based upon their violation of CFAA, the Georgia Trade Secrets Act, the Georgia Computer Systems Protection Act, and other misconduct alleged above.

137. That Plaintiffs be granted judgment against Defendants jointly and severally for the costs of these proceedings;

138. That Plaintiffs be granted pre-judgment and post judgment interest at the highest legal rate judgment on any judgment or award against Defendants; and

139. That the Court order such other and further relief as it deems appropriate.

Respectfully submitted, this 6th day of April, 2015.

**HAWKINS PARNELL**
**THACKSTON & YOUNG LLP**

*/s/ Brenton S. Bean*

**Brenton S. Bean**
Georgia Bar No. 044351

303 Peachtree Street, NE
Suite 4000
Telephone (404) 614-7400
Telecopier (404) 614-7500

*/s/ Gordon E. Billheimer, Jr.*

**Gordon E. Billheimer, Jr.**
Georgia Bar No. 056925

1717 West 6th Street
Suite 250
Austin, TX 78703-4777
(512) 687-6914 (phone)
(512) 687-6980 (fax)

*ATTORNEYS FOR PLAINTIFFS*